## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| SARAH M.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 3:22-cv-1852-DWD |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM & ORDER

**DUGAN, District Judge:**

Under 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision of Defendant, which denied Plaintiff's application for Disability Insurance Benefits (DIBs). For the reasons explained below, the Court **AFFIRMS** the final agency decision.

## I. Procedural History

Plaintiff was born on September 17, 1979. She protectively applied for DIBs on April 15, 2015. Plaintiff initially alleged a disability onset date of November 1, 2012, but that date was later amended to June 30, 2013. Plaintiff's date of last insured was December 31, 2017. The alleged disability was related to cervical radiculopathy, scoliosis, migraines, fibromyalgia, bone degeneration, nerve damage, sphincter dysfunction, chronic fatigue syndrome, anxiety, asthma, and severe memory loss. (Doc. 14-9, pg. 24). The claim was denied initially and on reconsideration. Plaintiff sought a hearing, which was held in October 2017 before an Administrative Law Judge ("ALJ"). In July 2018, Plaintiff received

---

[1]Plaintiff's full name will not be used due to privacy concerns.

an Unfavorable Decision. The Appeals Council denied review, so Plaintiff appealed to this Court. Before the Court could resolve the appeal, however, the parties agreed to a remand of the case to the agency. A second hearing was held on October 1, 2020. On November 25, 2020, Plaintiff received another Unfavorable Decision. Plaintiff filed written exceptions to that Unfavorable Decision, which were rejected by the Appeals Council in June 2022. Plaintiff has now exhausted her administrative remedies. Accordingly, the most recent Unfavorable Decision is final and ripe for judicial review.

## II. General Legal Standards

To qualify for DIBs, a claimant must be disabled. To assess a disability, the ALJ employs a "five-step sequential evaluation process." *See* 20 C.F.R. § 404.1520(a)(1), (2), (4). The ALJ asks whether: (1) the claimant is doing substantial gainful activity; (2) the claimant has a severe medically determinable physical or mental impairment that meets certain duration requirements or a combination of impairments that is severe and meets the duration requirements; (3) the claimant has an impairment that meets or equals an impairment listed in the regulations and satisfies the duration requirements; (4) in view of the RFC and past relevant work, she can perform past relevant work; and (5) in view of the claimant's RFC, age, education, and work experience, she can adjust to other work. *See* 20 C.F.R. § 404.1520(a)(4)-(g); *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

If the claimant is doing substantial gainful activity under step 1, does not have an impairment or combination of impairments as described at step 2, can perform past relevant work under step 4, or can adjust to other work under step 5, then the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(i),(ii), (iv), (v). If the claimant has an

impairment that meets the requirements of step 3 or is incapable of adjusting to other work under step 5, then she is disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii), (v). The claimant has the burden of proof at steps 1 to 4. *See Mandrell v. Kijakazi*, 25 F.4th 514, 516 (7th Cir. 2022). At step 5, however, the burden shifts to Defendant to show that the claimant can adjust to other work existing in "a significant number of jobs…in the national economy." *See Young*, 362 F.3d at 1000; *accord Brace v. Saul*, 970 F.3d 818, 820 (7th Cir. 2020).

Impairments and related symptoms may cause physical and mental limitations that affect the ability to work. *See* 20 C.F.R. § 404.1545(a)(1). Steps 4 and 5 assess the most a claimant can do at work despite those limitations. *See* 20 C.F.R. § 404.1545(a)(1); *accord* SSR 96-8p, 1996 WL 374184, *2; *Clifford v. Apfel*, 227 F.3d 863, 872-73 n. 7 (7th Cir. 2000). As such, a residual functional capacity ("RFC"), which the ALJ completes after step 3 but before steps 4 and 5, assesses the ability to perform sustained physical and mental activities in a work setting on a regular and continuing basis, *i.e.*, for eight hours a day and five days a week or an equivalent schedule. *See Tenhove v. Colvin*, 97 F. Supp. 2d 557, 568 (E.D. Wisc. 2013); SSR 96-8p, 1996 WL 374184, *2; *accord Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). An RFC must be based on the relevant medical and other evidence contained in the record. *See* 20 C.F.R. § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184, *2-3, 5.

In the RFC, the ALJ must identify the claimant's functional limitations and assess his work-related abilities on a function-by-function basis. *See Tenhove*, 97 F. Supp. 2d at 569; SSR 96-8p, 1996 WL 374184, *1, 3; *accord Lechner v. Barnhart*, 321 F. Supp. 2d 1015, 1036 (E.D. Wisc. 2004). The ALJ considers all impairments, including those that are nonsevere, and the claimant's ability to meet physical, mental, sensory, and other

3

requirements of work. *See* 20 C.F.R. § 404.1545(a)(2), (4); *see also Alesia v. Astrue*, 789 F. Supp. 2d 921, 933 (N.D. Ill. 2011) ("[T]he ALJ must consider the combined effect of all impairments, 'even those that would not be considered severe in isolation.' "). "An impairment or combination of impairments is not severe if it does not significantly limit [the] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1522(a). And, importantly, while a claimant's statements of pain or other symptoms are considered, they alone are not conclusive evidence of a disability. *See* 20 C.F.R. § 404.1529.

As to physical abilities, the ALJ assesses the nature and extent of physical limitations, then determines the RFC for work activity on a regular and continuing basis. *See* 20 C.F.R. § 404.1545(b). A limited ability to perform physical demands, such as sitting, standing, walking, lifting, carrying, pushing, pulling, reaching, handling, stooping, or crouching may reduce the ability to do "other work" at step 5. *See* 20 C.F.R. § 404.1545(b); *see also* SSR 96-8p, 1996 WL 374184, *5-6. After identifying a claimant's functional limitations and assessing his work abilities on a function-by-function basis, the RFC may be expressed by exertional category, such as "sedentary."[2] *See Tenhove*, 97 F. Supp. 2d at 569; *accord Lechner*, 321 F. Supp. 2d at 1036; SSR 96-8p, 1996 WL 374184, *3. To do a full range of work in an exertional category, the claimant must be able to perform substantially all of the functions at that level. *See* SSR 96-8p, 1996 WL 374184, *5-6.

Further, in the RFC, the ALJ must address medical source opinions. *See* SSR 96-8p,

---

[2] Sedentary work involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). A sedentary job involves sitting but often has walking and standing that is necessary to related duties. *See* 20 C.F.R. § 404.1567(a). Jobs are sedentary if walking and standing are required occasionally, and the other sedentary criteria are satisfied. *See* 20 C.F.R. § 404.1567(a).

1996 WL 374184, *7. If the RFC assessment conflicts with a medical source opinion, then the ALJ must explain why the opinion was not adopted. *See id.*; *accord Smith v. Colvin*, 9 F. Supp. 3d 875, 887 (E.D. Wisc. 2014). Medical opinions are considered with the following factors: (1) supportability; (2) consistency; (3) the relationship with the claimant; (4) specialization; and (5) other factors supporting or contradicting the opinion, including evidence showing familiarity with other evidence in the claim or an understanding of disability policies and evidentiary requirements. *See* 20 C.F.R. § 404.1520c(c). The most important factors to the persuasiveness of a medical opinion, however, are supportability and consistency. *See* 20 C.F.R. § 404.1520c(a), (b)(2).[3] The ALJ may, but is not required to, explain how the other factors were considered. *See* 20 C.F.R. § 404.1520c(c)(3)-(5).

### III. The ALJ's Decision

The ALJ noted, on remand, the Appeals Council directed it to consider medical source opinion evidence and the claimant's maximum RFC, to acquire evidence from a vocational expert, and to offer Plaintiff the opportunity for a new hearing. (Doc. 14-9, pg. 16). Further, the ALJ recognized that Plaintiff was required to establish a disability between the amended onset date of disability, June 30, 2013, and the date of last insured, December 31, 2017. (Doc. 14-9, pg. 17). For the reasons discussed below, the ALJ found Plaintiff was not under a disability between those dates. (Doc. 14-9, pg. 17).

---

[3]The more relevant the objective medical evidence and supporting explanations presented by a medical source are to *support* his or her medical opinions, the more persuasive the medical opinions will be. *See* 20 C.F.R. § 404.1520c(c)(1). The more *consistent* medical opinions are with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinions will be. *See* 20 C.F.R. § 404.1520c(c)(2).

At step 1, the ALJ found Plaintiff had not engaged in substantial gainful activity during the relevant period. (Doc. 14-9, pg. 19). At step 2, the ALJ found Plaintiff suffered from severe impairments through the date of last insured, including left trochanteric bursitis, mild scoliosis, facet arthropathy, asthma, migraines, fibromyalgia, obesity, depression, anxiety, somatic symptom disorder, and posttraumatic stress disorder. (Doc. 14-9, pg. 19). Those impairments were severe, as they limited Plaintiff's ability to perform basic work activities. (Doc. 14-9, pg. 19). Certain other conditions were found to be nonsevere, as there was no persuasive evidence suggesting they caused more than minimal limitations in the ability to perform basic work activities. (Doc. 14-9, pg. 19). Still, the ALJ considered the effect that those nonsevere impairments had on Plaintiff's ability to function. (Doc. 14-9, pg. 20). At step 3, the ALJ found she did not have an impairment or combination of impairments that met or medically equaled the severity of impairments listed in the regulations through the date of last insured. (Doc. 14-9, pg. 20).

Before proceeding to step 4, the ALJ assessed Plaintiff's RFC, finding as follows:

[T]hrough the date [of] last insured, the claimant had the…[RFC] to perform sedentary work as defined in 20 CFR 404.1567(a) except that she cannot climb[] ladders, ropes, or scaffolds and can only occasionally climb ramps and stairs. The claimant cannot engage in tasks requiring balancing on slippery or unexpectedly uneven surfaces or moving walkways. She can engage in no more than frequent stooping, kneeling, crouching and crawling and can perform no overhead reaching, pushing, or pulling bilaterally. The claimant can perform tasks requiring no more than frequent handling and fingering, and she must work in an environment where the noise level would be no more than 3-moderate. She cannot work at unprotected heights, around moving mechanical parts or other such hazards, and she can have no concentrated exposure to extreme heat, cold, humidity, wetness, dust, fumes[,] or other pulmonary irritants. The claimant is limited to performing simple, routine tasks and can perform work with production expectations, but the work must not be at a fast

> pace such as an assembly line. She cannot engage in work that requires
> tandem tasks, where other work functions would be dependent on her
> completion of a task. She is limited to work that requires only occasional
> changes in the work setting and she can have no more than occasional
> interaction with the public.

(Doc. 14-9, pg. 23).

In assessing the above RFC, the ALJ noted that, "[a]t the hearing...the claimant testified that she has an 8-year history of dominant right upper extremity nerve damage resulting in things flying out of her hand." (Doc. 14-9, pg. 24). Further, Plaintiff "claimed her hand jerks and she has difficulty writing her name, getting dressed, brushing her hair, holding a coffee cup, and carrying a water bottle." (Doc. 14-9, pg. 24). However, while Plaintiff's medically determinable impairments could reasonably cause her alleged symptoms, the ALJ found her statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical evidence and the other evidence of record. (Doc. 14-9, pg. 24). More specifically, Plaintiff's allegations of severe symptoms and limitations were inconsistent with the conservative treatment, objective diagnostic testing results, and observations of the treating medical sources. (Doc. 14-9, pg. 24). Likewise, there was no evidence of significant worsening symptoms since the date of last insured. (Doc. 14-9, pg. 25).

In support of these findings, the ALJ engaged in a thorough discussion of the medical evidence. The ALJ stated the physical examinations throughout the relevant period were found to be "essentially unremarkable as related to the claimant's neck and back impairment." (Doc. 14-9, pg. 25). Treatment notes referenced complaints of chronic pain, but the ALJ found the objective imaging revealed only mild scoliosis. (Doc. 14-9, pg.

25). Further, radiographs showed early degenerative disc disease, some degenerative arthritis of the sacroiliac joints, and facet arthropathy, but there was no canal stenosis or foraminal stenosis. (Doc. 14-9, pg. 25). Plaintiff reported muscle spasms around the amended alleged onset date of disability, June 30, 2013, but she was also "staying active" at that time. (Doc. 14-9, pg. 25). As a result, the ALJ noted that Plaintiff's normal to mild examination findings were inconsistent with her extreme complaints. (Doc. 14-9, pg. 25).

The ALJ noted, during a neurological examination on April 7, 2015, Plaintiff reported chronic neck pain caused by automobile accidents. (Doc. 14-9, pg. 25). Plaintiff also reported, *inter alia*, episodic reduced function of the right arm and shaking hands. (Doc. 14-9, pg. 25). However, the ALJ believed it was significant that the neurologist found a CT of the neck was normal, as that finding was inconsistent with Plaintiff's claim of cervical radiculopathy. (Doc. 14-9, pg. 25). Further, the neurologist's examination found no skeletal abnormalities, no joint deformity, no tenderness or swelling, normal strength throughout, normal motor tone with no spasticity or rigidity, no muscle atrophy, and normal sensation with no cervical radiculopathy. (Doc. 14-9, pg. 25).

In a consultative examination on August 26, 2015, Plaintiff complained of, *inter alia*, cervical radiculopathy attributable to an automobile accident. Plaintiff indicated to Dr. Austin Montgomery that she had neck pain, arm issues, and uncontrollable tremors. (Doc. 14-9, pg. 25). However, although Plaintiff had one or two tender spots in the back and the right shoulder, with right upper extremity atrophy, "the overall examination was otherwise normal." (Doc. 14-9, pg. 25). The ALJ noted Dr. Montgomery observed some limitation in the right shoulder range of motion and cervical range of motion, but

otherwise observed a normal range of motion in the lumbar spine. (Doc. 14-9, pg. 25). The ALJ also stated: "when noted, the remainder of the record documents…normal musculoskeletal range of motion. (Doc. 14-9, pg. 25). Therefore, despite Plaintiff's testimony of significant limitations from neck and back pain, the ALJ found the "treatment notes regularly show essentially normal musculoskeletal examinations with no significant tenderness or swelling." (Doc. 14-9, pg. 26). Likewise, the ALJ found the treatment notes indicated "generally normal physical examinations with a normal gait and station." (Doc. 14-9, pg. 26). Also, as to the alleged uncontrollable tremors, the ALJ noted "the record first indicated the tremor was psychogenic…[and] claims of any such tremor were not featured later in the record." (Doc. 14-9, pg. 27).

The ALJ noted that Plaintiff's treatment notes referenced fibromyalgia without evidence of specific trigger points. (Doc. 14-9, pg. 27). The ALJ discussed Plaintiff's examination by a rheumatologist on July 6, 2016. (Doc. 14-9, pg. 27). At that time, Plaintiff complained of chronic pain and fatigue, including pain in her hands and right shoulder. (Doc. 14-9, pg. 27). Plaintiff also reported the worst pain was in her cervical spine. (Doc. 14-9, pg. 27). The ALJ noted Plaintiff's physical examination by the rheumatologist showed no acute distress and no edema in the extremities. (Doc. 14-9, pg. 27). Also, a musculoskeletal examination revealed no synovitis in a standard 28 joint count. (Doc. 14-9, pgs. 26-27). There was some tenderness to palpation of the PIP joints, but the rheumatologist noted no myofascial trigger points present on examination. (Doc. 14-9, pg. 27). The ALJ stated that was inconsistent with a diagnosis of fibromyalgia. (Doc. 14-9, pg. 27). Radiographs of the right hand were normal. (Doc. 14-9, pg. 27).

Further, the ALJ noted objective imaging of, *inter alia*, facet arthropathy. (Doc. 14-9, pg. 27). Plaintiff's testimony of severely limited ability to lift, walk, and perform other activities, such as manipulative activities, was found to be extreme when compared to that objective imaging, which the ALJ found showed only mild abnormalities. (Doc. 14-9, pg. 27). The ALJ stated clinical signs were also limited and, despite references to back, neck, and joint pain, there was not an indication of inflammatory signs, significant or persistent range of motion problems, persistent or frequently recurring muscle spasms, nerve root impingement, or motor, sensory, or reflex loss. (Doc. 14-9, pg. 27). Plaintiff received only conservative medication management, without any specific or ongoing indications of side effects, and achieved general pain relief. (Doc. 14-9, pg. 27).

Although the ALJ found the record evinced adequate control of symptoms related to Plaintiff's physical conditions through conservative treatment modalities, such as longitudinally decreased dosages of narcotic pain medication, the ALJ accommodated Plaintiff's ongoing symptoms to the extent that they caused functional limitations. (Doc. 14-9, pg. 27). This was done in light of Plaintiff's testimony. (Doc. 14-9, pg. 27). The ALJ limited Plaintiff to work performed at the sedentary exertional level with additional postural and environmental restrictions. (Doc. 14-9, pg. 27). The ALJ stated its RFC assessment "more than accommodate[d]" Plaintiff's allegations in consideration of her physical condition, as "the totality of the medical records[,] including observations of treating and examining sources[] and the claimant's own statements[,] fail[ed] to provide convincing objective evidence to support" greater limitations. (Doc. 14-9, pg. 27).

10

Next, the ALJ discussed the medical opinion evidence. The ALJ noted the March 20, 2015, statement of Plaintiff's primary care physician, Dr. Gregory Climaco. (Doc. 14-9, pg. 28). Dr. Climaco opined that Plaintiff could not stand or walk up to 2 hours per day, sit six hours or more per day, occasionally lift 10 pounds, or work 40 hours a week due to anxiety, fibromyalgia, and migraines. (Doc. 14-9, pg. 28). The ALJ gave this opinion little weight because, despite Plaintiff's longitudinal history with Dr. Climaco, the severe limitations were inconsistent with the objective imaging and mild clinical signs discussed above. (Doc. 14-9, pg. 28). According to the ALJ, Dr. Climaco regularly noted that Plaintiff had normal examinations without debilitating symptoms that resulted in an inability to work. (Doc. 14-9, pg. 28). Further, Dr. Climaco "provide[d] very little in the way of actual functional limitations…instead provid[ing] a conclusory statement." (Doc. 14-9, pg. 28).

As to the consultative examination of Dr. Montgomery, which was conducted on August 26, 2015, the ALJ noted Plaintiff claimed her shoulder swelled, fingers locked, and she was unable to use one hand. (Doc. 14-9, pg. 29). The ALJ gave Dr. Montgomery's opinion partial weight. (Doc. 14-9, pg. 29). The ALJ noted that Dr. Montgomery conducted testing that was supportive of the objective findings and the shoulder and hand limitations assessed in the RFC. (Doc. 14-9, pg. 29). He noted shoulder range of motion deficits and reduced grip strength, but the ALJ found other records showed normal right shoulder range of motion and normal right and left hands without significant abnormalities shown on imaging. (Doc. 14-9, pg. 29). Dr. Montgomery's observations were normal other than Plaintiff's alleged distress from tremors, right hand dexterity, and numbness in the "right 5th finger and 4th - ulnar nerve." (Doc. 14-9, pg.

29). Also, Dr. Montgomery's clinical impressions were based on Plaintiff's statements, and the note Plaintiff could not contain fasciculations or tremors was inconsistent with the treating neurologist's opinion. (Doc. 14-9, pg. 29). The ALJ noted Dr. Montgomery's findings of 11 tender points, mild range of motion deficits in the shoulder, 2/5 right upper extremity strength, and 3/5 upper right grip strength. (Doc. 14-9, pg. 29). The ALJ stated, "[o]verall, while the generally normal physical examination supports a finding of the claimant's ability to engage in each of these activities, Dr. Montgomery's opinion is vague and does not provide limitations on a function-by-function basis." (Doc. 14-9, pg. 29).

The ALJ also discussed the initial assessment of the non-examining state medical consultant, Dr. Kenneth R. Smith, M.D., from September 2015, and the reconsideration assessment of the non-examining state medical consultant, Dr. James L. Greco, M.D., from May 2016. (Doc. 14-9, pgs. 29-30). The ALJ noted Dr. Smith "assigned less than the full range of the light exertional level," while Dr. Greco "assigned less than the full range of the sedentary exertional level." (Doc. 14-9, pg. 30). The ALJ noted that Dr. Greco limited Plaintiff to frequent climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling, as well as occasional climbing of ladders, ropes, and scaffolds. (Doc. 14-9, pg. 30). Further, Plaintiff was to avoid concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, dusts, gases, and poor ventilation. (Doc. 14-9, pg. 30). Drs. Smith and Greco's opinions were given partial weight by the ALJ, as they were generally consistent with the medical evidence and other evidence of record. (Doc. 14-9, pg. 30). However, the ALJ found the record did not support additional manipulative and environmental accommodations. (Doc. 14-9, pg. 30). The ALJ emphasized, though, "I

12

have accommodated the claimant's subjective complaints to the greatest extent possible consistent with the objective evidence of record." (Doc. 14-9, pg. 30).

The ALJ noted its consideration of the response to interrogatories of Dr. Olivia M. Bajor, D.O., from January 29, 2018. (Doc. 14-9, pg. 31). The ALJ gave that opinion partial weight. (Doc. 14-9, pg. 31). The ALJ noted that Dr. Bajor assessed Plaintiff as capable of sedentary work, as Plaintiff could stand and walk for 1 hour each and could sit for 8 hours in an 8-hour workday. (Doc. 14-9, pg. 31). Further, Plaintiff could lift and carry 10 lbs frequently and do the same with 20 pounds occasionally. (Doc. 14-9, pg. 31). Dr. Bajor "specifically noted" reports in the medical record were inconsistent. (Doc. 14-9, pg. 31). For example, "[c]linical consultative exam [of Dr. Montgomery] in Exhibit 10F reported diminished strength and dexterity in the right hand and shoulder, but subsequent exams (Exhibits 13F-14F) do not report similar findings." (Doc. 14-9, pg. 31). Further, Plaintiff's primary care provider examinations were consistently normal to mild. (Doc. 14-9, pg. 31). The ALJ noted that Dr. Bajor limited Plaintiff to mostly occasional postural maneuvers, consistent with Plaintiff's complaints. Overall, the ALJ stated, "Dr. Bajor…explained her opinion with reference to specific medical signs and findings, and her opinions [we]re generally consistent with the evidence as a whole." (Doc. 14-9, pg. 31).

In sum, based on the objective medical evidence and Plaintiff's course of treatment, clinical signs, medications, level of daily activity, and work history, the ALJ found Plaintiff retained the above-described RFC. (Doc. 14-9, pg. 32). Plaintiff's subjective reports, including the limitations on her ability to perform activities of daily living, found minimal support in the objective medical evidence of record. (Doc. 14-9, pg. 32). While

Plaintiff suffered from severe impairments, the ALJ noted conservative treatment provided symptom relief and stabilization. (Doc. 14-9, pg. 32). Further, the clinical findings were generally mild throughout the period at issue, as providers documented normal examinations without significant changes to or worsening of symptoms. (Doc. 14-9, pg. 32). When considered in totality, the ALJ found Plaintiff's statements of limitations supported the exertional and non-exertional accommodations outlined in the RFC, which appropriately accommodated her subjective restrictions. (Doc. 14-9, pg. 32).

At step 4, the ALJ found Plaintiff was unable to perform past relevant work, which included work as a dental assistant. (Doc. 14-9, pg. 33). The ALJ noted Plaintiff had a high school education and one year of college education. (Doc. 14-9, pg. 33). Further, the transferability of jobs skills was not material to the determination of disability, as a finding of not disabled would be appropriate regardless of whether Plaintiff had transferable job skills. (Doc. 14-9, pg. 33). At step 5, the ALJ indicated, if Plaintiff had the RFC to perform the full range of sedentary work, a finding of "not disabled" would be directed. (Doc. 14-9, pg. 34). However, Plaintiff's ability to perform all or substantially all of the requirements of sedentary work was impeded by additional limitations. (Doc. 14-9, pg. 34). Therefore, to determine the extent to which those limitations eroded the unskilled sedentary occupational base through the date of last insured, the ALJ relied on the testimony of a vocational expert. (Doc. 14-9, pg. 34). The vocational expert testified that, given Plaintiff's age, education, work experience, and RFC, she would have been able to perform "sedentary, unskilled, SVP 2 occupations." (Doc. 14-9, pg. 34). Accordingly, at step 5, the ALJ found there were jobs existing in significant numbers in

the national economy that Plaintiff could have performed through the date of last insured. (Doc. 14-9, pg. 33). For these reasons, the ALJ found Plaintiff was not disabled between June 30, 2013, and December 31, 2017. (Doc. 14-9, pg. 34).

## IV. Analysis[4]

The Court's review of the ALJ's decision is "extremely limited" and "very deferential." *See* 42 U.S.C. § 405(g); *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022) (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)). Findings of fact, supported by substantial evidence, are conclusive. *See* 42 U.S.C. § 405(g); *accord Clifford*, 227 F.3d at 869. The Court will reverse the ALJ's decision only if the findings of fact were not supported by substantial evidence or the ALJ applied the wrong legal standard. *See Clifford*, 227 F.3d at 869; *accord Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *See Clifford*, 227 F.3d at 869 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *accord Jarnutowski*, 48 F.4th at 773. If reasonable minds could differ about the alleged disability and the ALJ's decision is supported by substantial evidence, then the Court will affirm the ALJ. *See Jarnutowski*, 48 F.4th at 773 (quoting *Elder*, 529 F.3d at 413). The Court reviews the entire record, but does not reweigh the evidence, resolve conflicts, decide credibility, or substitute its judgment for that of the ALJ. *See Clifford*, 227 F.3d at 869; *accord Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). However, an ALJ must build a logical bridge between the evidence and the conclusions.

---

[4]The Court reviewed the entire evidentiary record. The portions of the evidentiary record that are relevant to Plaintiff's present arguments and the Court's resolution of the case are incorporated into the analysis below.

*See Jarnutowski*, 48 F.4th at 773 (quoting *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021)).

### 1. Opinion of Dr. Bajor

On January 23, 2018, the SSA requested the professional opinion of Dr. Bajor in relation to Plaintiff's claim. (Doc. 14-7, pg. 631). Dr. Bajor was provided exhibits that were selected for inclusion in the record, as well as interrogatories that were to be completed based on that evidence and her professional knowledge. (Doc. 14-7, pg. 631).

Dr. Bajor opined that Plaintiff could frequently lift up to 10 lbs and occasionally lift 11 to 20 lbs. (Doc. 14-7, pg. 632). Plaintiff could frequently carry up to 10 lbs and occasionally carry 11 to 20 lbs. (Doc. 14-7, pg. 632). When asked to identify the particular medical or clinical findings that supported these assessments, Dr. Bajor noted Plaintiff's diagnosis of facet arthropathy in the cervical spine at Exhibit 12F. (Doc. 14-7, pg. 632).

Further, Dr. Bajor opined that, at a given time, Plaintiff could sit for 6 hours, stand for 1 hour, and walk for 30 minutes. (Doc. 14-7, pg. 633). In an 8-hour workday, Plaintiff could sit for 8 hours, stand for 1 hour, and walk for 1 hour. (Doc. 14-7, pg. 632). When asked to identify the particular medical or clinical findings that supported these assessments, Dr. Bajor noted "exam…by orthopedic surgeon, claimant has only slight limp without assistive device and may continue regular activity." (Doc. 14-7, pg. 633).

As to the right hand, Dr. Bajor opined that Plaintiff could continuously feel and push/pull, frequently reach (all but overhead), and occasionally reach (overhead), handle, and finger. (Doc. 14-7, pg. 634). When asked to identify the particular medical or clinical findings that supported these assessments, Dr. Bajor noted the "[r]eports in medical record are inconsistent. Clinical exam in 10F reports diminished strength and

dexterity in Rt. Hand, shoulder, but subsequent exams (13F, 1/14/17) do not report similar findings." (Doc. 14-7, pg. 634).

Dr. Bajor answer "yes" when asked whether there was sufficient objective medical and other evidence to allow her to form opinions about the nature and severity of the impairments during the relevant timeframe. (Doc. 14-7, pg. 639). Dr. Bajor identified the following impairments, among others, established by the evidence and supported with a citation: chronic neck pain and facet arthropathy (12F); tremors, possibly psychogenic in etiology (7F); and arthritis/arthralgia (13F). (Doc. 14-7, pg. 639).

Now, with her first argument, Plaintiff states the ALJ did not "specifically acknowledge" Dr. Bajor's opinion that Plaintiff could only occasionally handle and finger with the dominant right upper extremity. (Doc. 18, pg. 8). Further, the ALJ allegedly "incorrectly cited the handwritten notes [of Dr. Bajor] below th[at] limitation." (Doc. 18, pg. 8). As such, Plaintiff argues the ALJ "objectively misstated" Dr. Bajor's opinion and suggested she "discount[ed] her own opinion by the handwritten notes." (Doc. 18, pgs. 8-9). Plaintiff argues it cannot be assumed Dr. Bajor meant anything other than Plaintiff could occasionally handle and finger with the right upper extremity. (Doc. 18, pg. 9).

Defendant responds that the ALJ noted Dr. Bajor, in her opinion on Plaintiff's ability to use her hands, cited Exhibit 10F to show diminished strength and dexterity in Plaintiff's right hand and shoulder. (Doc. 24, pg. 7). The ALJ also noted, incorrectly, that Dr. Bajor cited Exhibits 13F *and* 14F to show contrary findings. However, according to Defendant, a review of Dr. Bajor's opinion shows that she did rely upon Exhibit 13F, which included a report of an examination from January 4, 2017. (Doc. 24, pg. 7). The

examination allegedly showed no diminished strength or dexterity in Plaintiff's right hand and shoulder. (Doc. 24, pg. 7). The fact the ALJ miscited to Exhibits, in Defendant's view, does not undermine its decision to give Dr. Bajor's opinion partial weight, as the ALJ reasonably compared Dr. Bajor's opinion to primary care provider examinations that consistently showed Plaintiff's normal to mild use of the hands. (Doc. 24, pg. 7).

Defendant also argues the ALJ did not find Dr. Bajor discounted her own opinion through handwritten notes. (Doc. 24, pg. 7). Defendant argues the ALJ accurately quoted Dr. Bajor's handwritten comments. (Doc. 24, pg. 7). However, based on the whole record, including the treatment notes and objective test results, Defendant argues the ALJ declined to adopt the opinion that Plaintiff could only occasionally handle and finger with the right hand. (Doc. 24, pg. 8). Therefore, Defendant indicates the Court should not reweigh the evidence or substitute its judgment for that of the ALJ. (Doc. 24, pg. 7).

Here, it is undisputed that the ALJ considered Dr. Bajor's opinion, which was requested by the SSA. (Doc. 14-9, pg. 31). Plaintiff does not make a contrary argument; instead, she suggests the ALJ did not "specifically acknowledge" a particular aspect of Dr. Bajor's opinion, namely, that Plaintiff could only occasionally handle and finger with the right hand. (Docs. 14-9, pg. 31; 18, pg. 8). The Court finds Plaintiff's argument is overly technical and flawed for the reasons discussed below.

The ALJ discussed the handwritten notes that "identif[ied] the particular medical or clinical findings…[that] supported…[Dr. Bajor's] assessment of any limitations and why the findings support[ed] the assessment." (Docs. 14-7, pg. 634; 14-9, pg. 31). It is obvious to the Court that Dr. Bajor's handwritten notes, as well as the ALJ's discussion

of those handwritten notes, contemplated Plaintiff's ability to occasionally handle or finger with the right extremity. (Docs. 14-7, pg. 634; 14-9, pg. 31). Immediately below the area where Dr. Bajor found, *inter alia*, Plaintiff could occasionally finger and feel with the right hand, she stated: "Reports in medical record are inconsistent. Clinical exam in 10F reports diminished strength and dexterity in Rt. Hand, shoulder, but subsequent exams (13F, 1/14/17) do not report similar findings." (Doc. 14-7, pg. 634). The ALJ referenced those handwritten notes, then added its belief that "primary care provider examinations are consistently normal to mild." (Doc. 14-9, pg. 31). The ALJ also noted, generally, Dr. Bajor "limited the claimant to mostly occasional postural maneuvers, consistent with the claimant's complaints," and Dr. Bajor explained her opinion with reference to specific medical signs and findings. (Doc. 14-9, pg. 31). Dr. Bajor's opinions were "generally consistent with the evidence as a whole." (Doc. 14-9, pg. 31). For these reasons, the Court finds Plaintiff is incorrect that the ALJ failed to consider, *i.e.*, failed to "specifically acknowledge," Dr. Bajor's opinion on Plaintiff's right hand. (Docs. 14-9, pg. 31; 18, pg. 8).

Further, the Court finds no error in the ALJ's decision to find, contrary to Dr. Bajor's opinion, that Plaintiff could "perform tasks requiring no more than *frequent* handling and fingering." (Doc. 14-9, pg. 23) (Emphasis added.). As noted above, Dr. Bajor and the ALJ both acknowledged the inconsistency of the evidence with respect to the strength and dexterity of the right hand and shoulder. (Docs. 14-7, pg. 634; 14-9, pg. 31). Ultimately, the ALJ expressly stated that it was granting Dr. Bajor's opinion "partial weight." (Doc. 14-9, pg. 31). The ALJ added that "provider examinations [we]re consistently normal to mild." (Doc. 14-9, pg. 31). In doing so, the Court finds the ALJ did

not misstate Dr. Bajor's opinion, as argued by Plaintiff, but described its consideration of that opinion in light of the medical and other evidence of record. (Doc. 14-9, pg. 31).

Similarly, the ALJ did not commit error by indicating Dr. Bajor, in her opinion, cited to both Exhibits 13F *and* 14F rather than to only Exhibit 13F. (Docs. 14-7, pg. 634; 14-9, pg. 31). The bottom line is that Dr. Bajor cited to Exhibit 13F, which details a date of visit of January 4, 2017, for the proposition that subsequent examinations, *i.e.*, examinations after that of Dr. Montgomery on August 26, 2015, did not indicate Plaintiff suffered from diminished strength and dexterity in the right hand and shoulder. (Doc. 14-7, pgs. 348-59, 420-32, 634). Exhibit 13F, which documents no such diminished strength or dexterity but includes normal x-rays of the right shoulder and hand from July 6, 2016, reasonably stands for that proposition. (Doc. 14-7, pgs. 420-32). Therefore, it is irrelevant that the ALJ included an extra citation to Exhibit 14F, presumably by mistake.

Notably, the ALJ's decision to limit Plaintiff to frequent handling and fingering is supported by the provider examinations of record, as the ALJ noted. For example, in February and March 2016, Plaintiff had no musculoskeletal symptoms and, on examination, there was "normal movement of extremities." (Doc. 14-7, pgs. 223, 225, 227, 230, 277, 279). On examination in April 2016, Plaintiff was observed to have normal musculoskeletal symptoms and "[n]o skeletal abnormalities or deformities." (Doc. 14-7, pgs. 265, 273). Likewise, as to Plaintiff's joints, there was "no deformity or dislocation, no tenderness or swelling, normal…[range of motion], no pain." (Doc. 14-7, pg. 265). In February 2017, despite some cervical tenderness and decreased range of motion, Plaintiff had 5/5 strength in the right upper extremities and was intact to gross touch to bilateral

upper extremities. (Doc. 14-7, pg. 379). From April to October 2017, despite "arthralgias and joint pain" on one occasion, Plaintiff's musculoskeletal symptoms and examinations were normal. (Doc. 14-7, pgs. 565, 568, 570, 574-75, 578-79, 585, 588, 590, 593, 596, 599, 603, 606, 615). Therefore, the ALJ's findings here were supported by substantial evidence.

## 2. Opinion of Dr. Montgomery

Plaintiff presented to Dr. Montgomery on August 26, 2015. (Doc. 14-7, pg. 348). Based on the medical information available for review, Dr. Montgomery noted, *inter alia*, Plaintiff had cervical radiculopathy and a transient paralysis of a limb. (Doc. 14-7, pg. 348). He also identified a prior diagnosis of fibromyalgia. (Doc. 14-7, pg. 349).

Dr. Montgomery noted Plaintiff's chief complaints were, among other things, cervical radiculopathy, bone degeneration, and nerve damage in the neck, upper back, and right arm. (Doc. 14-7, pg. 348). Dr. Montgomery also noted Plaintiff's history of present complaints. (Doc. 14-7, pg. 348). Plaintiff was in separate severe motor vehicle accidents in 2007 and 2013. (Doc. 14-7, pg. 348). Since that time, she had neck pain and arm issues. (Doc. 14-7, pg. 348). Plaintiff described uncontrollable tremors on the right side of her body, degeneration in the bones around her shoulder and upper arm and neck on the right, right arm and upper back pain, and "she obviously ha[d] nerve damage in the neck involving different nerves, even in her right hand." (Doc. 14-7, pgs. 348-49). Some limitations pointed to ulnar nerve dysfunction and other limitations pointed to radial nerve dysfunction. (Doc. 14-7, pg. 349). Plaintiff's tremors caused distress and were "a big problem," as Dr. Montgomery noted "she had constant tremors in her right arm and right leg as well as other uncontrollable movements" during the interview. (Doc. 14-

7, pgs. 349-50). Plaintiff's "right shoulder swells and her fingers lock on the right side." (Doc. 14-7, pg. 349). Plaintiff's fingers and hands also got feverish. (Doc. 14-7, pg. 349).

On examination, Plaintiff's neck was supple, but she could not turn to the right very well. (Doc. 14-7, pgs. 350-51). Plaintiff had tender spots in the back, especially over the scapulae and the entire right shoulder area. (Doc. 14-7, pg. 351). Plaintiff's right upper arm was hypertrophied compared to the left upper arm, and "it apparently [wa]s due to the constant tremors and contraction of the[] muscles…[that] she is not able to control." (Doc. 14-7, pg. 351). Further, Plaintiff's right hand was not very dexterous. (Doc. 14-7, pg. 351). Plaintiff had numbness in the 5th finger and the medial half of the 4th finger, implying some involvement of the ulnar nerve. (Doc. 14-7, pg. 351). However, Plaintiff's numbness in the thumb also suggested radial involvement. (Doc. 14-7, pg. 351).

In terms of a clinical impression, Dr. Montgomery noted Plaintiff had been in two severe motor vehicle accidents, one with a concussion and the other "with multiple injuries involving the central nervous system." (Doc. 14-7, pg. 351). The latter accident resulted in constant tremors, fasciculations, and jerking spastic motions that were painful and, according to Plaintiff's doctors, were probably causing degeneration of the bone around the right shoulder. (Doc. 14-7, pg. 351). Plaintiff could not "contain the constant fasciculations and tremors in her body." (Doc. 14-7, pg. 348).

With respect to her second argument, Plaintiff notes Dr. Montgomery observed that the dominant right upper extremity, when compared to the left upper extremity, was hypertrophied. (Doc. 18, pg. 9). Plaintiff argues this observation, as well as the fact that Dr. Montgomery observed numbness in the thumb, was "completely absent from the

22

ALJ's discussion." (Doc. 18, pg. 9). Further, Plaintiff argues the imaging relied upon by the ALJ for the proposition that Plaintiff had a normal right extremity would not have shown the ulnar and radial nerve issues noted by Dr. Montgomery. (Doc. 18, pgs. 9-10).

In response, Defendant argues the ALJ found Dr. Montgomery's findings supported the limitations assessed because "other records show[ed] normal right shoulder range of motion and normal right and left hands without any significant abnormalities seen on imaging." (Doc. 24, pgs. 8-9). Therefore, rather than ignoring Dr. Montgomery's findings as to the right shoulder and hand limitations, "[t]he ALJ reasonably weighed Dr. Montgomery's findings against other record evidence and explained her reasons for giving his opinion partial weight." (Doc. 24, pg. 9).

Here, the Court disagrees the ALJ failed to observe Plaintiff's "right upper arm [wa]s hypertrophied compared to the left," as found by Dr. Montgomery. (Docs. 14-7, pg. 351; 18, pg. 9). The ALJ stated, "[w]hile the claimant had one or two tender spots in the back and especially over the scapulae and the right shoulder, *with right upper extremity atrophy* [*sic*]…the overall examination was otherwise normal. (Docs. 14-7, pg. 351; 14-9, pg. 25) (Emphasis added.). The ALJ also noted Plaintiff complained to Dr. Montgomery of "arm issues…and uncontrollable tremors," the latter of which were found by Dr. Montgomery to be the cause of the hypertrophy. (Docs. 14-7, pg. 351; 14-9, pg. 25). Aside from these specific statements, though, the ALJ also noted that Dr. Montgomery observed some limitation in the right shoulder and cervical ranges of motion, but no abnormal range of motion relating to the lumbar spine. (Doc. 14-9, pg. 25). Further, the ALJ noted Dr. Montgomery found 11 tender points, including two in the right shoulder and one in

23

the right arm, and 2/5 right upper extremity strength. (Docs. 14-7, pg. 354; 14-9, pg. 29).

Similarly, it is not clear to the Court that the ALJ "ignored the statement [of Dr. Montgomery] about numbness in the thumb." (Doc. 18, pg. 9). The ALJ noted Dr. Montgomery found Plaintiff's "right hand was not very dexterous, numbness right 5th finger and 4th—ulnar nerve." (Doc. 14-9, pg. 29). Dr. Montgomery attributed the numbness in the thumb to the radial nerve, and the ALJ did not note that finding. However, the ALJ did note Dr. Montgomery, in the neurological section of his opinion, which discussed all right-hand numbness, found "[p]inprick and vibratory sensation were intact" on examination. (Docs. 14-7, pg. 351; 14-9, pg. 25). Likewise, the ALJ noted Dr. Montgomery's finding that Plaintiff had a right-hand grip strength of 3/5. (Docs. 14-7, pg. 356; 14-9, pg. 29). It must be remembered, in light of these arguments, "an ALJ 'need not provide a complete written evaluation of every piece of testimony and evidence.' " *See Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015). Regardless, though, the ALJ recognized Dr. Montgomery "conducted testing supportive of some of the objective findings and supportive of shoulder and hand limitations in the" RFC. (Doc. 14-9, pg. 29).

Further, the Court rejects Plaintiff's contention that the ALJ erred by noting, in a discussion of Dr. Montgomery's opinion, "other records show[] normal right shoulder range of motion and normal right and left hands without any significant abnormalities seen on imaging." (Doc. 14-9, pg. 29). Plaintiff suggests the ALJ's statement was improper because the impairment related to her right extremity stems from nerve, rather than bone, damage. However, the imaging was referenced after the ALJ noted Dr. Montgomery's testing was supportive of the shoulder and hand limitations in the RFC. (Doc. 14-9, pg.

29). Further, the imaging was referenced in the context of Dr. Montgomery's noted "shoulder range of motion deficits and reduced grip strength," which seems to render the imaging relevant. (Doc. 14-9, pg. 29). Therefore, in a case where Plaintiff is alleging impairments related to the right extremity, the Court finds it entirely unsurprising that the ALJ would note the way in which that imaging assisted in determining the functionality of the right extremity, even if Plaintiff alleges nerve damage. For these reasons, the Court finds the ALJ did not err when considering Dr. Montgomery's opinion.

### 3. The Treating Source Statement Regarding Plaintiff's Right Hand

On March 20, 2015, Plaintiff was assessed by her primary care physician, Dr. Climaco. (Doc. 14-7, pg. 176). He diagnosed Plaintiff with chronic pain and cervical radiculopathy. (Doc. 14-7, pg. 176). Dr. Climaco marked the box "no" when asked whether Plaintiff, in an 8-hour workday and 40-hour workweek, could stand and/or walk up to 2 hours, sit for 6 or more hours, occasionally lift and/or carry up to 10 lbs, or frequently lift and/or carry up to a few lbs. (Doc. 14-7, pg. 176). Dr. Climaco described the objective and clinical findings that supported his opinions by stating, *inter alia*, Plaintiff had pain and muscle spasms with prolonged sitting or standing, difficulty turning her head to the right, and numbness in the right hand. (Doc. 14-7, pg. 176).

Now, as to her third argument, Plaintiff admits the ALJ discussed the above medical source opinion of her primary care physician, Dr. Climaco, which was accorded little weight, but states the ALJ "omit[ted] any reference to Dr. Climaco's statement about the Plaintiff's right upper extremity" and right-hand numbness. (Doc. 18, pg. 10). Plaintiff states this would usually be unimportant; however, here, "errors and omissions in the

analysis of the…right hand function are a theme in the ALJ decision." (Doc. 18, pg. 10).

In response, Defendant points out that Plaintiff is not challenging the decision to give Dr. Climaco's opinion little weight. (Doc. 24, pg. 9). Defendant further notes the ALJ's decision is replete with references to subjective reports of nerve damage and medical records documenting, *inter alia*, right hand numbness. (Doc. 24, pg. 9).

Here, the ALJ gave the entire 1-page opinion of Dr. Climaco "little weight" because, although he was Plaintiff's primary care doctor, Dr. Climaco provided a "conclusory statement" with "very little in the way of actual functional limitations." (Doc. 14-9, pg. 28). Indeed, the 1-page opinion provides two "check box" questions with little room for meaningful comments. Therefore, even if the Court were to find error and remand the case for consideration of the comment identified by Plaintiff, the ALJ would likely find Dr. Climaco's entire "conclusory statement" is still entitled to "little weight." *See Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018) ("An error is harmless only if we are convinced that the ALJ would reach the same result on remand."). And, regardless of the claimed omission to consider that statement, the ALJ found Dr. Climaco "regularly note[d] normal examinations," including as to the musculoskeletal system, "without anything supportive of such debilitating symptoms resulting in an inability to work (Exhibit 1F)." (Doc. 14-9, pg. 28). Plaintiff's alleged severe limitations were inconsistent with the objective evidence. (Doc. 14-9, pg. 28). Indeed, the Court made similar findings as to Plaintiff's right hand and shoulder with respect to Dr. Bajor. As such, the Court finds the ALJ did not ignore or otherwise error in its consideration of Dr. Climaco's opinion.

### 4. The Failure to Mention Physical Therapy Records

26

On April 24, 2015, Plaintiff presented for physical therapy. (Doc. 14-7, pg. 185). The primary and rehabilitative diagnosis was, *inter alia*, fibromyalgia and generalized weakness. (Doc. 14-7, pg. 185). Plaintiff presented with decreased range of motion, decreased strength, and increased pain that was scaled at 7/10 during resting and 10/10 during activity. (Doc. 14-7, pg. 185). Plaintiff reported "extreme neck pain and [an] inability to turn head to…[the right, right upper extremity] weakness, tremors, and occasional 'locking.' " (Doc. 14-7, pg. 185). The physical therapist observed a guarded right upper extremity and hypertonicity throughout "B UT and paraspinals." (Doc. 14-7, pg. 185). Plaintiff had gross limitations into all planes with the right upper extremity, and the pain and weakness reportedly limited her range of motion. (Doc. 14-7, pg. 185).

Plaintiff argues the above-noted physical therapy notes describe hypertonicity in the right upper extremity. (Doc. 18, pg. 11). Plaintiff argues the ALJ failed to discuss that evidence, which "describe[es] abnormality with neurologic origin that pertains to the right dominant upper extremity." (Doc. 18, pg. 11). Plaintiff notes, again, such an omission, by itself, would be unimportant. (Doc. 18, pg. 11). In this case, though, "errors and omissions in the analysis of the…right upper extremity function are a theme in the ALJ decision." (Doc. 18, pg. 11). In response, Defendant argues the ALJ was not required to summarize or discuss every piece of evidence in the record. (Doc. 24, pgs. 9-10). Defendant stresses, even though that is the case, the ALJ did not ignore the line of evidence related to Plaintiff's right arm and hand problems. (Doc. 24, pg. 10).

Here, Plaintiff takes issue with the ALJ's failure to discuss an isolated observation of a physical therapist that was made on a single date of service in April 2015. As noted

above, however, "an ALJ 'need not provide a complete written evaluation of every piece of testimony and evidence.' " *See Curvin*, 778 F.3d at 651. This is especially true where, as here, the ALJ did not otherwise ignore the evidence related to Plaintiff's right upper extremity. Indeed, the ALJ's decision thoroughly discusses the issues related to Plaintiff's right upper extremity, including, *inter alia*, Plaintiff's hearing testimony and written statements relating to nerve damage, Plaintiff's statements in the neurological examination in April 2015, Plaintiff's statements and Dr. Montgomery's comprehensive observations in August 2015, Plaintiff's complaints of right shoulder pain and examination in July 2016, and the findings of Dr. Bajor in January 2018. (Docs. 14-7, 631; 14-9, pgs. 24-25, 29). Dr. Bajor indicated the evidence was inconsistent as to the diminished strength and dexterity in the right hand and shoulder. (Doc. 14-7, pg. 634). However, the ALJ indicated its RFC and other findings were based on the entire record of objective medical and other evidence. (Doc. 149, pgs. 12, 15, 23-25). And, as noted above with respect to Dr. Bajor's opinion, the findings related to Plaintiff's right hand and shoulder are supported by substantial evidence. Accordingly, the Court rejects Plaintiff's argument that the ALJ erred by failing to mention the above-discussed treatment record.

### 5. The Impermissible Playing of Doctor

On April 7, 2015, Plaintiff presented to Dr. Roula Al-Dahhak, M.D., of St. Louis University. (Doc. 14-7, pg. 161). At that time, Dr. Al-Dahhak noted a prior CT of the neck was "NL." (Doc. 14-7, pg. 165). Plaintiff noted neck pain, joint pain, and tremors in the past 90 days. (Doc. 14-7, pg. 167). On examination, Dr. Al-Dahhak noted Plaintiff's neck was symmetric and she had no skeletal abnormalities or deformities, scoliosis or

kyphosis, or contractures. (Doc. 14-7, pg. 167). Further, in terms of her joints, Plaintiff had normal range of motion and no deformities or dislocations, tenderness or swelling, edema in the lower extremities, or pain. (Doc. 14-7, pg. 167). Plaintiff also had normal muscle tone with no spasticity or rigidity, normal muscle bulk with no atrophy or hypertrophy, no contractures, 5/5 muscle strength in all categories, and 2/2 muscle stretch reflexes in three categories. (Doc. 14-7, pg. 168).

Plaintiff argues, even if there was a normal CT of the neck from an unknown time, the ALJ "improperly played doctor when she stated 'a normal cervical spine CT is inconsistent with her claim of cervical radiculopathy.' " (Doc. 18, pg. 12). Plaintiff notes her pain from cervical radiculopathy was treated with a steroid injection at a time when she was already taking methadone, lyrica, and oxycodone. (Docs. 14-7, pg. 396; 18, pg. 12). The doctor added baclofen and noted an MRI showing cervical indentation of the thecal sac and facet arthropathy. (Docs. 14-7, pg. 396; 18, pgs. 12-13). Plaintiff states the ALJ did not discuss this evidence, and "[t]he individual assessments of cervical radiculopathy…are too numerous to cite." (Doc. 18, pg. 13).

In response, Defendant argues Plaintiff's characterization of the CT is incomplete. (Doc. 24, pg. 10). In particular, Defendant notes a neurologist reviewed a CT scan of Plaintiff's neck and noted the results were normal. (Doc. 24, pg. 10). Further, on examination, the neurologist observed that Plaintiff had normal muscle tone and strength, sensation, and range of motion in the hands and feet. (Doc. 24, pg. 10).

Here, the ALJ noted, on April 7, 2015, Plaintiff complained of chronic neck pain. (Doc. 14-9, pg. 25). The ALJ also correctly noted the neurologist's observation that a CT

29

scan of the neck was normal. (Doc. 14-9, pg. 25). It is true the ALJ indicated "[a] normal cervical spine CT is inconsistent with her claim of cervical radiculopathy," but that was not the end of the analysis. (Doc. 14-9, pg. 25). After making this statement, the ALJ noted the neurologist's examination indicated: "no skeletal abnormalities, no joint deformity, no tenderness or swelling, normal speech and mentation…5/5 strength throughout, normal motor tone with no spasticity or rigidity, no muscle atrophy, and normal sensation with no cervical radiculopathy." (Doc. 14-9, pg. 25). It does not appear the ALJ's findings as to Plaintiff's cervical radiculopathy were based solely, or even primarily, on the CT of the neck. (Doc. 14-9, pg. 25). The neurologist's examination clearly informed the ALJ's immediate analysis. (Doc. 14-9, pg. 25). And, more broadly, the ALJ indicated "[p]hysical examinations throughout the relevant period were essentially unremarkable as related to the claimant's neck…impairment." (Doc. 14-9, pg. 25). The ALJ further stated, "[d]espite the claimant's testimony of such significant neck…pain and limitation, treatment notes regularly show essentially normal musculoskeletal examinations with no significant joint tenderness or swelling." (Doc. 14-9, pg. 26). Also, "Dr. Montgomery observed some limitation in…cervical range of motion…[but] the remainder of the record documents…normal musculoskeletal range of motion." (Doc. 14-9, pg. 25). Similar findings have been noted by the Court above. As such, the ALJ did not improperly play doctor, did not ignore evidence, and its findings were supported by substantial evidence.

## V. Conclusion

For these reasons, the Court **AFFIRMS** the final agency decision. The Clerk of the Court is **DIRECTED** to enter judgment for Defendant and against Plaintiff.

**SO ORDERED.**

Dated: September 29, 2023.

s/ *David W. Dugan*

_____
DAVID W. DUGAN
United States District Judge